Illinois Appellate Court, Fifth Division, Staff and Session. Honorable Justice Franklin W. Mitchell v. Poseidon. Good morning, please be seated. Okay, so if our clerk could call our first case. 123-2035, consolidated with 123-2037, People v. Dorothea Thomas. Okay, our third panel member, Justice Johnson, will listen to the online recording. And she's not going to be joining us this morning. So, we know you have a, we granted your motion on an addition of time, so we'll expect you to keep track of that. And I'll keep track of time generally. I'll do my best. When you step up, be sure to identify yourself and keep your voice up because the microphone records but it doesn't amplify. So with that, we'll begin. May it please the Court. My name is Deepa Punjabi and I represent one of the appellants, Siobhan Booker. My colleague here, Ryan Miller, represents the other appellant, Dorothea Thomas. Both appellants challenged the sufficiency of their convictions for theft and vendor fraud. I will be talking to you today about Ms. Booker's challenge to her convictions. And in determining whether Ms. Booker's convictions can be sustained, this Court should consider several questions. First, was there proof beyond a reasonable doubt that there was some sort of unauthorized control or control by deception over the proceeds at issue? Second, if there was, was it conclusively proven that the conduct actually connected back to Ms. Booker? Third, were these circumstances in which we can infer Ms. Booker's conduct constituted a knowing exercise of unauthorized control or control by deception? And I'd submit that the answer to all of these questions is no. The State has not proven that this was anything more than a significant billing error. Ms. Booker argues that while the evidence establishes that an overbilling did occur in this case, the evidence did not establish any criminal act, but rather merely shows what was likely a mistake or billing error that unfortunately continued to repeat itself in each order for each patient. And this mistake resulted from the... How do you, what do you say about Ms. Kranz's testimony? So Ms. Kranz's testimony, the State points to it to find Ms. Booker's criminal knowledge. The State argues that Ms. Kranz informed Ms. Booker of what was going on and that Ms. Booker fired her, giving rise to an inference of guilty knowledge. But if you really look at Ms. Kranz's testimony, you know, it's not the case that Ms. Kranz informed Ms. Booker of this specific overbilling. Ms. Kranz told Ms. Booker that she thought the figures were a little high with the pricing and the units. And she also told Ms. Booker that she felt they were billing the wrong way because they were using a miscellaneous code instead of a specific code, that that was a red flag to her. But she was clearly mistaken. I mean, even the Blue Cross Blue Shield witness had testified they were supposed to be using a miscellaneous code because the product was too new to have a specific billing code. And so from Ms. Booker's perspective, this was an employee that had repeatedly refused to comply with her duties for erroneous reasons, such as not wanting to use a miscellaneous code, even though that's what they were supposed to do. I don't think Ms. Booker firing Ms. Kranz under those circumstances can reasonably lead to some sort of guilty knowledge. So on your sufficiency challenge, you challenged the act and the intention, right? You're saying this was akin to data entry.  So she didn't knowingly violate anything. You concede, though, that undoubtedly there were government funds at issue. I don't concede that. I know that the state takes the position that I have conceded that. And I don't. To the extent that there may have been one place in my brief where... I refer to the owner of the funds of the state of Illinois through their Medicaid insurers. That was a misstatement. I don't concede that. Now, the rest of my argument is certainly consistent with the idea that it was the managed care organizations that were the owners where I argue that they were the ones that were in a position to grant control or give authorization to the DEXCOM orders, and that they did give authorization and that's why these were not unauthorized. So your sufficiency challenge is to the state's case and its totality. That's correct. That's correct. You know, I think the specific calculations here do support the notion that this was simply a calculation error because the overbilling that has occurred each time is in a multiple of four. You know, if the overbilling was more random, that would be a different matter. But the fact that you do have the censors being sold in packs of four, and the specific overbilling that keeps occurring is in a multiple of four, that really does support the notion that this was an unintentional error that occurred by confusing the per box price for the per unit price. And what about the invoice that was put into every file? The medical invoice. Yes, Your Honor. Those facts, you know, the state points to the fact that this invoice was used, but I would argue that doesn't necessarily give rise to an inference of guilty knowledge or some sort of deception. I mean, if any reasonable finder of fact could have found knowledge on the part of your client, that would be sufficient at this point, correct? Yes, Your Honor. And I'll just point out, first of all, that they didn't proceed on that specific type of fraud. They used it more. They only proceeded to calculate their losses on the type of fraud they alleged that occurred between the confusion in the per box versus per unit price. But they do argue that the use of this Medline invoice went to some sort of proof of guilty knowledge or knowledge of some deception. But I don't think you can make that inference because the state has not presented any evidence that Ms. Booker would necessarily have been aware that Integrity was not allowed to use the Medline MSRP or retail price on the invoices that were submitted for preauthorization. You know, it is not unheard of for durable medical equipment companies to use an MSRP or retail price as their stated cost of procurement, even if they are able to buy at cheaper bulk or wholesale prices, and that there would have been a contract between Integrity and the managed care organizations that governed all of this, you know, what Integrity can claim as their cost of procurement, what the managed care is supposed to reimburse them. But it all depends on the rules of that specific contract, which the state here did not introduce at trial. So we don't actually know the terms. But the Blue Cross Blue Shield witness, I believe it was Ms. Erin Mutter McKeon, she testified that with this particular type of order, because it required preauthorization, Integrity was supposed to cite their actual cost of procurement to get preapproval. Notably, she also did not cite any contract term stating the same. But even if you credit her testimony that that is what Integrity was supposed to submit under their terms with Blue Cross Blue Shield, the state has still not pointed to any evidence proving that Ms. Booker would have known that this is not the kind of product where they were allowed to cite an MSRP or retail for their cost of procurement. So the fact that Ms. Booker saw that it was the Medline MSRP that had been placed in each of these orders to, in the document submitted to gain preapproval, that does not necessarily prove she would have known something improper was occurring. And it wouldn't have been her job to know. You know, her job as biller was focused on assigning the correct billing codes. She wouldn't necessarily. No. Her job was to assign the correct billing codes. Now, the amounts she copied from the forms that had already been assembled and preapproved by the insurance, she was just, they had already been authorized. She was trusting that authorization, and she was just copying what the insurance, copying down what the insurance had already approved, those amounts. She wouldn't necessarily have been intimately familiar with the details of those contract terms of pricing and what they are and aren't allowed to submit. But how many she was billing for, how many censors she was billing for? She was putting in that amount. No. Those were all submitted in the preapproval. My understanding of the record, Your Honor, is that all of those things were in the packet that was submitted for preapproval, which she and Ms. Thomas state was for the, done by other employees at Integrity at the prior authorization department. And they would then, the insurance company, or I believe Ms. Mutter-McKeon said they contracted that piece out. The insurance company or their third-party contractor would go over all of that. The prescription, the, how many censors the patient was supposed to receive. Right. The amounts that Integrity was ordering for them, and the pricing and that MEDLINE invoice. They had all of that before them, and then they would approve that, and then it would go to Ms. Booker for billing. And just stepping back. So she had no knowledge of how many censors were actually being sent to any particular patient? Is that your? Well, that was another piece that she didn't necessarily have any knowledge of. There's no evidence that she knew how much Integrity was being reimbursed. She didn't know how many units were ever ultimately delivered, for that matter. There wasn't any evidence of that. And just stepping back. I mean, these overall circumstances are inconsistent with knowledge that something unauthorized was happening here. She would have no reason to know that using these numbers, that again, that the insurance company received them beforehand and approved it. That she would somehow, using these numbers that had already been approved, that this would be an assertion of unauthorized control. When the insurance companies had just authorized the orders. And neither would she know that this would constitute any sort of deception. The insurance company examined all of this beforehand. And they did so, again, with the patient's prescription, how many censors they were supposed to get every month. As well as the amount of Integrity that they were ordering for each patient. Are you sure you're talking about the MCOs? Is that who you're talking about? That's who I'm talking about. That they had all of that prior to approval. Then they would, based on that, they would approve it. And then it would go to Ms. Booker to assign the correct billing code. The total loss or overbilling, the total amount of overbilling was how much? I believe they calculated it to $326,000 something. And your client, she received a loan from her mother in an amount? She received a personal loan. It was not drawn on Integrity's funds. I mean, this was just, there was no evidence that this wasn't just a personal loan she was getting for personal reasons from a relative, from her mother. There was nothing connecting that to her role as biller at Integrity. Nothing at all. There, were there any other questions that I could answer for this court? No, and I think we're almost to the end of your ten minutes. All right, well thank you for these reasons. We'd ask that you reverse Ms. Booker's convictions. Good morning, Your Honors. May it please the Court, Ryan Miller for Appellant DeRetha Thomas. In this case, to make up for the insufficiencies of its evidence, the State asked this Court to adopt two very broad propositions. First, it asked this Court to flip corporate liability principles on their head by finding that a CEO is necessarily criminally liable for any and all wrongdoing that occurs at her company. And second, the State asked this Court to create for it, through judicial notice, an ownership interest in billions of dollars of funds that are possessed and managed by private health insurance companies. This Court should reject these arguments. I will first address Ms. Thomas's liability before turning to the governmental property question. So first, the State did not dispute that in order to prove Ms. Thomas guilty, it had to prove beyond a reasonable doubt that she either prepared the invoices that billed the MCOs for four boxes of sensors, while knowing that only one would be delivered, or that she told another person to do the same. However, the State's theory of trial was that this criminal act was proven purely by the fact of Ms. Thomas's role as a CEO. How many employees did Integrity have? We know that they had about seven or eight employees. And so, based on testimony that Ms. Thomas was the CEO and that she oversaw everything at the company, the State put forth the theory of trial that nothing got by her. However, there was not a single piece of evidence defining what it meant for Ms. Thomas to be the CEO or to oversee these various departments. So we have no idea, for instance, whether she ever looked at invoices before they were sent to the MCOs, and particularly, we don't know whether she was in any way involved in the specific invoices that are at issue here. So the mere fact that she was the CEO and that she oversaw these different departments is in no way proof beyond a reasonable doubt that she is criminally liable for that specific criminal act of preparing those invoices for four boxes of sensors per month. The few pieces of hearsay evidence that the State does point to, to try to connect Ms. Thomas to that criminal act, do not actually constitute either her personal conduct nor any admission of the specific, again, criminal act. Are you, by hearsay, referring to her statements to the investigators? Correct, yes. Not really hearsay. So Ms. Thomas does deny some of these statements. But so taking first the investigator, Gallivand's, testimony concerning her statements about overbilling, so one of the statements characterizes this evidence in its brief. It claims that she admitted she was overbilling when Gallivand's actual testimony was that she told me she could see that this was overbilling and that integrity should reimburse Blue Cross Blue Shield for the overbilling. So again, in the context of this case where there is no evidence that Ms. Thomas was ever involved in the creation of these invoices, that should not be seen as a personal admission of her own conduct. Is it your position that there was no evidence that she had knowledge that the company was overbilling to the tune of $300,000 in a couple of years, that she had no knowledge of that? And are you saying that knowledge, if she had knowledge of it in a company this small and the person responsible for it was her daughter, that would not be sufficient to uphold this conviction? Is that your position? Yeah, we don't concede knowledge. Our primary argument is that regardless of the knowledge element there, the state must still prove that Actus Reis, which again, under criminal liability principles, means that she either did that, she either prepared those invoices, or she told somebody to do the same. Or if she had full knowledge of it, the complete ability to stop it because she is the CEO and the person doing it is her daughter, that, in your view, is not enough to sustain this conviction? That's correct, Your Honor. Again, while there were seven or eight employees at this company, there were also approximately 700 patients that they supplied care for. So without the state introducing any evidence about sort of the scope of this company's services or what it looked like day-to-day, how many invoices they submitted on a monthly or yearly basis, there was just simply not enough evidence to infer knowledge, let alone the criminal act, on Ms. Thomas' part because, again, we just know so little about how this company operated and particularly know so, so little about what Ms. Thomas' actual role meant at this company. So, again, Galavan's testimony about overbilling, just because she acknowledged that it may have occurred after the fact is not proof that she was responsible for it in the first place. She admitted to putting the Medline invoices in the files, right? So, Your Honor, I don't think that she actually admitted to personally doing so. So the testimony there from Galavan was that she first said that Integrity was not obtaining their censors for Medline. The prosecutor then asked Galavan, did she admit to only putting the Medline invoice into each of the files? And Galavan responded, she did. But, again, I think in the context of this case where there is not a single piece of evidence corroborating the state's apparent position that Ms. Thomas was involved in that actus reus, that single piece of testimony she did, it's not reasonable to infer that that was an admission of personal conduct. I think that that was really, as it was with the line of testimony prior to that, it was simply Ms. Thomas acknowledging that Integrity had repeatedly used that Medline invoice. But just as importantly, the state never alleged that any misuse or repeated use of that Medline invoice was the theft that occurred here. Just to cover up. Your Honor, the state only relied on that Medline invoice to prove intent. Their theory was that the only theft that occurred was, again, that discrepancy between billing for four boxes while knowingly delivering at most one box per month. Their whole state was hinged on the idea that there was a calculated loss of $326,000. That's where it treated the state because it had 43. That amount of money had absolutely nothing to do with any price discrepancies in the Medline invoice between the MSRP and the supplier price, nor the Medline invoice versus other supplier invoices. So, again, even if Ms. Thomas had been tied to repeatedly using that Medline invoice, that was not the actus reus that the state had to prove. Again, the state had proved that she was preparing the invoices for four boxes. This Medline invoice was not approved. You parse this theft into little pieces, into where there's the overcharging per censor and there's the overcharging per censors that were never delivered. You want to parse that. Maybe that's an involvement in one part of it but not the other part of it. Is that what you're saying? Again, the state did not allege that using that Medline invoice resulted in any loss whatsoever by the MCOs or the state. That was not the state's position. Their position was that the only theft that occurred was that discrepancy between four boxes and one box. They did not introduce any regulations that using that MSRP from Medline invoice was unlawful. And, again, it was only that discrepancy, again, between the four boxes and one box. Overcharging for things that were not ever actually delivered, that that was the theft. Correct. Not the overcharging for what was delivered. Right. Correct. The state never calculated any loss, in other words, as a result of using that Medline invoice. So that was not, even using that Medline invoice, if Ms. Thomas could be personally connected to it, which, again, our position is that she was not personally connected to repeatedly using that Medline invoice, that was not the actus reus that the state had to prove. And it is not, beyond a reasonable doubt, an inference that Ms. Thomas actually committed this actus reus. So, finally, the state also asserts that the Blue Cross Blue Shield investigator, Mudder McKeon, her testimony that Ms. Thomas called her to follow up about the delayed payments, is proof that somehow Ms. Thomas was involved in the billing that resulted in those delayed payments. The state doesn't really articulate why, you know, calling, a CEO calling to ask about delayed payments is somehow proof that she committed a criminal act to result in those delayed payments. So, in sum, even taking all of the state's witnesses as completely credible, the state's evidence failed to put Ms. Thomas anywhere near the specific criminal act that was alleged here. And, again, the state's position at trial is that the criminal act was only creating invoices for four boxes while delivering only one, or telling another person to do the same. So this court, on this basis, this court should reverse Ms. Thomas' conviction on all counts. So, unless the court has any further questions about Ms. Thomas' liability, I'll turn to the state's failure to prove a loss of governmental property in excess of $100,000. So, here, as we know, these Medicaid recipients receive their care through MCOs. These are private health insurance companies. So, at the outset, in the most literal sense, the entity that paid for these censors was a private health care company. We also know from this evidence and from the case law that in an MCO arrangement like this, the state is paying the MCO a flat per patient fee called a capitation fee. But, in exchange, the MCO is on the hook for any cost to which that patient is entitled. So, importantly, there is not a one-to-one relationship between what the state spends on a given recipient and what the MCO actually spends on that recipient. Is it your position that a fraud against an MCO is never involved in state funds or governmental funds? Not that that could never be proven, but given the serious dose of evidence here, that was not proven here. So, again, we know nothing about the actual contractual relationship between the state of Illinois and the MCOs. We know nothing about what those capitation fees were. So, we have no idea what the state's actual expenditures on these recipients was during this time period. But we do know that the shift of the cost of actually supplying the patient has been shifted to the MCO by the state. Correct. I'm paying you for this patient. You take the risk that the cost goes up or down, whatever happens. Correct, Your Honor. So, given that complicated arrangement, it was not sufficient for the state simply to establish that these patients received their care through Medicaid. A significant amount more of evidence was required to actually prove a loss of governmental property in excess of $100,000. The state effectively concedes that it did not prove this element at trial by asking this court to take judicial notice of these elements. So, again, it's asking for this judicial notice for the first time on appeal of this arguably complex legal theory that these were, in fact, governmental funds. This request for judicial notice fails for several reasons. So, first, judicial notice is only permissible for facts that are readily verifiable and which are not subject to reasonable dispute. Here, the state does not have any single source stating MCO funds constitute governmental property. They can only present cases and ask this court for inferences to reach that conclusion, but that is not a fact that is readily verifiable. And is not subject to reasonable dispute. In addition, judicial notice is completely inappropriate in this case because the state's request presents a very complex legal and policy decision with very broad consequences. And it would not be appropriate to resolve that very complex question with no fact-finding whatsoever at the trial court and without any input from stakeholders like a Blue Cross Blue Shield about whether the state is actually an owner of the funds that they possess and that they intend to take a profit on. So, for these reasons, the court should reject the state's request for judicial notice. And, again, where that request is effectively a concession that this element was not proven at trial, this court can resolve this purely on the basis of judicial notice, find that the element was not proven, and reverse Ms. Thomas' conviction on all accounts for that reason. But why would we reverse a conviction as opposed to send her back for resentencing? It's a sentencing enhancement, isn't it? No, Your Honor. This affected far more than just that sentencing enhancement. The issue here is that the state misidentified the property that was at issue here. And so we know from this Illinois Supreme Court's decision in Espinoza in 2015 that in an offense against property, so theft here, the identity of that property is an element of the offense that must be laid out in the charging instrument. Here we know, particularly from Counts 2 and 3, that the state, when it charged this case and indicted this case, did not know the property that was actually going to be proven at trial. So Counts 2 and 3 allege that the Illinois HFS made payments to Ms. Thomas. The state didn't introduce a single piece of evidence about any payment whatsoever from HFS to anybody, let alone to Ms. Thomas. It also didn't introduce any payments to Ms. Thomas in her personal capacity, at most it was checks that she endorsed that were made out to Integrity's bank account. So clearly when the state indicted this case, it thought it was going to prove that HFS cut checks to Ms. Thomas and that this was governmental property in excess of $100,000. That's not what the state's evidence actually proved. It only proved, if anything, overpayments made by MCOs over $100,000. So again, the identity of the property is an element of the offense. That's from Espinoza. The state misidentified the property that the defendants took unauthorized control of in this case. So this requires vacating her convictions entirely and not merely a vacation of her sentencing enhancement. I'm not familiar with Espinoza. I'll look at it. I assume you've cited it in your brief. In our reply brief, yes. But your position is that you have to identify the property as an element of the offense, even though the sentencing scheme as laid out says that if it is governmental property in excess of $100,000, it is elevated to a Class X. Espinoza's the same sentencing scheme? No. Espinoza concerned naming the victim of an offense against the person. But what Espinoza says is that in offenses against property or the person, the identity of either that person or property is an element that must be laid out in the charging instrument. Okay. So further, even if this Court were to find that judicial notice were appropriate here, the theory that the state has some ownership interest in these funds fails on the merits. So the state relies on the statutory definition of owner in the criminal code, as well as Fuel v. Oglesby. But both of those make clear that, in this case, the state was not an owner under those definitions. So under that definition, owner requires that entity to be able to give control to another to control the property at issue. So here, that would mean that the state of Illinois' consent was required before an MCO could remit payment to a provider like Integrity. The state did not prove that at trial and has not presented any case law to suggest that the state has to give consent before an MCO could remit payment on invoices that is sent to it by a provider. The state next contends that it had an ownership interest in the funds that are managed by these MCOs, relying primarily on both Oglesby and Kotlars. Both of those cases are readily distinguishable. So in both of those cases, it was the government agency in question that was a party to the contract from which those defendants unlawfully diverted or steered funds. Here, the state of Illinois was not a party to the contracts that we're talking about here. The contract that we're talking about here is between the MCOs, these private companies, and Integrity. We know from Midwest Emergency Associates, which is a First District case in 2008, that in this arrangement, in this MCO arrangement, the state of Illinois is not in privity of contract with the provider, so here, Integrity. So the state was not a party to the contract, unlike in Oglesby and Kotlars. So those cases are both distinguishable. They also both do not concern health care, Medicaid, or MCO arrangements. Putting that, I think, a little bit differently, unlike in both of those cases, assuming for the sake of argument that any overpayment was made, there is no situation in which that exact amount was going to end up back in the possession of the state. If the overpayments had not been made, it only ever would have gone back to the MCO for either further expenditure on patient care or to become private profit for that company. So that, again, distinguishes this case from both Oglesby and Kotlars, in which there, had the defendant not unlawfully diverted the funds at issue, that exact amount of money would have remained in the state's possession. That is not the case here, and so both of those cases are distinguishable and do not create an ownership interest here for the state in these MCO funds. The state otherwise looks to federal regulations delineating situations in which, if overpayments are proven, the state may owe the federal government some amount of money or any overpayments that are recovered come back to the state. But the state, again, never attempted to prove that such overpayments were recovered in this case. It didn't even ask for restitution here. We have no idea what happened with any alleged overpayments. And so just because there are certain regulations that allow for overpayments to be recouped, does not mean that the state actually lost $100,000 of its own governmental property. You're talking about the federal regulation, 42 U.S.C.A.? Correct, yes. I just have a question, which you're the one person who doesn't have a horse in this race, but if we agree with this argument, is there any reason it would not apply to Ms. Booker as well? No, I think that if the state agrees that governmental property was not proven here, that would apply to Ms. Booker as well. So for these reasons, the state failed to prove beyond a reasonable doubt that the state of Illinois was deprived of over $100,000 specifically of governmental property. Now, in a similar vein, the state failed to prove the knowledge aspect, that Ms. Thomas knew that this was governmental property. At most, it proved that she knew that she was contracting with private health insurance companies administering Medicaid to these patients, and where I think it is a safe assumption that Ms. Thomas knows that in this NCO arrangement, the NCOs intend to take a profit on this money, on the capitation fees that are paid to them. That is not proof that she knew that these were governmental funds, so that is another reason why both counts 1 and 2 fail. Next, counts 2 and 3 also must be vacated for the reason I mentioned earlier. Again, those counts indicted Ms. Thomas for causing HFS to cut checks to her in her individual capacity, yet the state did not present a single piece of evidence about any payments from HFS to anybody. So for that reason, counts 2 and 3 on their own must also be vacated. So in sum, this Court should reverse Ms. Thomas' conviction on all counts, only in the alternative given the state's concession on one act, one crime, should this Court either reverse one of Ms. Thomas' death convictions or remand to the trial court to do the same. Thank you. Thank you. He's waiting for you to look up. Whenever you're ready, Counsel. Good morning, Your Honor. Proposal Counsel, may it please the Court, I am Assistant Attorney General Nick Moeller on behalf of the people. I think I'd like to start by taking a big step back, because one thing neither defendant talked about there very extensively was the standard of review, and that's important because the standard of review is what decides this case. We don't take the evidence in the light most favorable to the defendant, which is what a lot of the arguments you just heard were geared toward. Well, if you believe the defendant's testimony. No, we take the evidence in the light most favorable to the state, and the judgment can only be overturned if no reasonable person could have found defendants guilty beyond a reasonable doubt. I think I mentioned that. You did, Your Honor. Where were we? And part of that is it's not just you have to credit the witnesses, the state's witnesses, and as here explicitly the trial court did, but it's also all reasonable inferences have to be made in favor of the state. And so that means even when we're not talking about direct eyewitness testimony, if the circumstantial evidence supports a reasonable inference of guilt, this Court has to accept that the trial court would have made that inference. The next clarification I want to make is what the actual crime is here, because counsel kept talking about the state had to prove that Ms. Thomason specific either knew and told someone to send these requests or that she did it herself. That's not right. The crime here is theft. The action of theft is obtaining the proceeds. It's not the specific act charge is not necessarily the sending in of the wrong request. It's did you exert control or obtain the proceeds. And here that is what we're talking about. It doesn't come down to just specifically who typed in what, who pressed the enter button to send it along. It's who exercised control, who participated in exercising control or obtaining the government's property. With that underway, I'd like to turn to the actual evidence. This is a case about common sense and common knowledge. There doesn't seem to be any dispute that Integrity was overbilling the Medicaid providers, and it was doing it in two ways. They were both overstating costs to inflate reimbursement values, and they were billing for things they never actually sent. While the state only quantified the portion for the things that were said to be sent but weren't, the theft encompassed everything. So you do not agree with the counsel's statement that it was limited to billing for things that were never sent? No, Your Honor, because the elements of the crime do not require a quantification of the loss. It's just the property. And so for the base crime, it was just a matter of was property taken, and that was taken in two ways explained by the witnesses, both the overcharging based on the fraudulent use of the bedline invoice and then by the billing for things they'd never sent. While they only quantified the one part, that was because the state only had to prove up to $100,000. Anything beyond that would have been a waste of the trial court's time. So then if we know that this overbilling has happened, the question comes down to the mens rea, who knew about it and were they doing it knowingly? And that's where common sense comes in. There's a couple ways we can look at this. One thing people commonly look to is, well, the person responsible for the crime, who's receiving the benefits? And if we look, the person physically obtaining the benefits in the first place, that's Ms. Thomas. She was endorsing the checks. The checks were coming to her company that she owned. She's the first person to receive. And that's circumstantial evidence that she knew what she was doing because she's the one receiving the ill-begotten gains. Her company. Her company, but also she's the one actually getting the checks that she's signing. And it's her company and it's a small company. Yes, a small company. But she's not the only one receiving gains because there's also evidence of checks going to Ms. Booker. Ms. Booker, at the time, integrity, was receiving thousands of dollars in ill-gotten goods from the Medicaid system. She was getting thousands of dollars of checks from integrity and a, I believe it was $45,000 loan from her mother who owns integrity. That also is circumstantial evidence. She was receiving the ill-gotten goods. Someone could reasonably make that inference based on this evidence. But that's not all we have because we also have lots of evidence of guilt. As Your Honor put it, I believe it was the cover-up. When we look at Ms. Booker, when an employee at this small company came to her and said, hey, I think we're overbilling, and it was not just the fact that they were using the miscellaneous code. It was also, we're overcharging, which goes to the heart of what the theft was in this matter. Ms. Booker immediately, on the second time when it was brought up again, she fired Ms. Prance and not just fired her but had her taken out by police. The quote from the witness was she was acting hysterical. Those are not the actions of someone who's made a mistake. When you're told there's an audit, there will likely be an audit. Sure, there may be some fear, but the type of reaction here was not someone who had made a mistake. It was not someone who didn't know malfeasance was going on. It was a guilty person seeing the scheme coming down. And that's circumstantial evidence that Ms. Booker knew what was going on and was participating in it. We also know that contrary to her testimony that this was all a mistake, she didn't know these things, when she talked to the Inspector Gallivan, she admitted, much like Ms. Thomas did, that she knew that overcharging was going on and that she knew these prices were not the correct prices. Let me be very clear on the direct evidence. She knew that the Medline price was not the price being bought, that these things were being bought for. One can then reasonably infer from that she knew that was wrong. We don't just have to rely on her conversation or Ms. Thomas' conversation with the Inspector because their names are also on the invoices for these censors coming in. Their names are all over these things. They're the ones receiving the ill-gotten goods, and any time anyone brings up a red flag of, hey, something may be wrong here, they act guiltily. With Ms. Booker, it was fired on Ms. Krantz, which, in an eight-person company, is not something typically just a biller can do. That shows she's involved more in this company than she would like to cast it now on appeal. But then we can also look at the evidence of guilt of Ms. Thomas for how she reacts. When she is sent, addressed to her, a request by the Medicaid provider for the documents proving that they're not defrauding the Medicaid provider, the first thing she does, rather than gathering the records the company has, one can infer the first thing she does. Because right after this, this request for, give us the proof of delivery to your patients, all of a sudden Integrity is sending out these. They are not common business, it would appear, having patients say that I've been receiving everything prescribed for the past few months. At least the Blue Cross Blue Shield to get to know that that's not what they look for in this type of situation. And it gets worse, because after doing this suspicious act of trying to cover it up, she doesn't admit to it when it's done to her, but tries to tell Inspector Galvin it was just a strange coincidence that she happened to send these things out at the time that she was being investigated for fraud. And you have to take all these statements in the light of, this is occurring when people know they're already caught. Ms. Booker is acting once it's brought to her attention someone else knows and an audit might be on the way. Ms. Thomas is acting when the audit is occurring. Every statement they make after that point, taken in the reasonable inferences to the state, has to be seen as people trying to cover their trail. It's helpful to have that review of the evidence, the proof at trial. What proof was there that these were government funds? What's the proof at trial of that? Turning to that, Your Honor, I'd first like, I promise it's on the topic. I'd like to point out, I believe, Justice McVeigh, you had the question of how does this affect the two defendants separately. I would argue that there was a concession in the brief about the government property. It can be called a misstatement now, but at the very least, that's a forfeiture of the argument that it was never made. And though it was noted it was not a concession here, I would point out that for Defendant Booker, there was no actual argument put out, even at oral argument, of how this was not governmental property. So at this point, there was a concession, but even if there weren't, if it was a misstatement, that's a clear forfeiture, and so that avenue is foreclosed. Which is a limitation on the parties, but not on the court. That is a quotation that has been put forth by the Supreme Court, Your Honor, but the Supreme Court has also laid out guidance to the appellate court that forfeiture are meant to be upheld. And if it was a concession, it was a waiver. If it's a concession, it is a waiver, it is invited error, and it can't be touched in any fashion, which the State's first point is. Turning to Defendant Thomas' argument about governmental property, I'd first like to point out the State has not conceded that if there's no judicial notice that we lose. I would point to the State's brief on page 21. We explicitly say that even if you put judicial notice aside, there's enough evidence. Well, that's what Justice Ginsburg just asked you about. What is that evidence? So the evidence is, first, both insurance Medicaid providers say that they are doing this, they are providing this health service in contracts to the State, and they are reimbursed by the State for it. So you have both of the MCO representatives on the record testifying, yes, the State has contracted with us to administer its Medicaid program. And we don't know that much about that contract, but we do know that the risk of pricing has been passed on to the MCOs. Correct? There is a risk, yes. There is a risk of loss in their fee structure. But what we have... They're paid for patients. Yes, Your Honor. But one has to use common sense in this instance to think, if these insurance companies truly are losing on every patient, if they're not receiving enough money to cover loan and service, let alone the profit they expect to make, this system wouldn't exist. You mean there's no such thing as a free lunch? I'm an economics major, Your Honor. I would say no, and especially not when you involve government contracts. With insurance companies. The insurance company is doing this to make a profit. What is happening, if you look at it in the most common sense way, is that the State of Illinois has its funds dedicated for Medicaid. They are contracting with the insurance companies to administer those funds. Part of those funds happen to be a fee to the MCOs. Wouldn't it have been helpful if the State had put on a witness to inform the trial judge of that? It would have been more evidence, Your Honor. But the question here is not, what was the best trial practice? The question is, was there enough for a rational person? But I still don't see the evidence you're pointing to. What you're saying is, at some point, the MCOs would say, I'm out of here, I'm not doing this anymore, I'm not making any money. The MCOs said they're administering the Medicaid system, and they're being reimbursed. So that means they're getting the money. That's what a different witness said. It's not what either of the insurance companies said. But even putting that aside, what that means is, what is really, in effect, changing is how much they make off this system. Because there is no other system of Medicaid in the State. This is the main system, and so this is where the Medicaid dollars go. And this comes to a point that doesn't have to be judicial notice. Because it's also, we know that a fact finder goes in, and they're entitled to use their common sense and their common knowledge. And it involves that when everyone is talking about Medicaid, every witness, when they talk about it, is talking about Medicaid. Many of them point out, with the insurance companies, the explicit division between the private part of the company and the Medicaid part. And so common knowledge says that when you say Medicaid, using that term is the same as saying government funds. Because that's what Medicaid is. It's a government program. Yes, it's a government program, but that's a separate crime. That was charged separately. They were charged with stealing from a government program. And that's not where this argument goes. This is government property. Right, Your Honor, but the proceeds of the government program, the government program does not exist as just this nebulous idea. The government program is the money. If the program exists to pay for medical services, the Medicaid funds that they refer to, the Medicaid program they're referring to, is those funds, and that's really an element. So invoking Medicaid is sufficient to meet the state's burden? It would be, Your Honor, but that's not all that happened here. Because they went further to say and explain that they're contracting with the Medicaid, that the state is reimbursing them. And then if you look further, you can see where the state then exercised control over this. Because the entity who actually says in the record, you have to stop paying these funds, that wasn't a decision made by the MCOs. That was the state stepped in and told them to stop paying. Okay. And that's in the record. And so now you not only have this is Medicaid, they're contracting them to use these government funds to do that. You have them stepping in and saying when that gets cut off. And that type of control is the type of possessory interest required for theft. And then even if we need to take the next judicial, the step of judicial notice, counsel said that the state is in this case asking you to make that large step of taking that. We're not. The Supreme Court already made that step in Castillo. There it said when you can verify from these sources what government, who owns the property, the government property is, that's the end of the game. You do not have to bring someone in to show the deed to government property. You don't have to bring someone in to come and explain all these details. The fact that everyone knows all you have to do is look at the Medicaid statutes, see that they set forth. Look at these pages of regulations, right? And you're saying in these regulations it says the state would have to reimburse the federal government if the state recovered the funds that were taken, which. That's one part to show control. I mean, what I'm saying, Your Honor, is the establishment of Medicaid and the set of the statutes that set forth these funds being available, the budgeting acts providing these funds, that is proof that those are state funds. And you can look to those. We can't reasonably question that the statutes. The state funds went to the MCOs, no doubt about it. That was government money. But then once the MCOs had it, it's their money because the government gave it to them. Right, but if they didn't spend it on the treatment, the government would take it. It's not my paycheck. It's government money. If I didn't push, I'm a government employee. You're a paycheck too. If I don't come to work and I don't do my job, that's not going to be my money. Then they will come to take some of it back. It's similar to, say, a gas station contracts a clerk. The clerk has a cash register. They give out the change. They take the money in. It's still the gas stations and gas stations being robbed, even though there's probably a separate argument that you can have multiple victims to the same theft, as the court has noted in cases where, like, people are staying over in-house, and so they don't have the direct property. I apologize. I forget the case name of that. But if you steal something from someone borrowing property, you have committed theft against both that person and the actual property owner. So that's not really an issue here. Here we have someone contracted to hand out, to deal with the state's money, and they're paid to do that. That doesn't change the fact that it's government money they're handing out, and they wouldn't do it if the government stopped giving them that money. And so can you, and I'm not to cut you off, but in this argument can you also address Ms. Thomas' argument that if we don't agree with you, we have to reverse the conviction as opposed to remand for resentencing because of us. Yes, Your Honor. Because I thought this was a sentencing enhancement. It is, Your Honor. It's in a different part of the statute, which is why the knowing does not translate, as one part of the argument is the knowing translates from the theft.  But that doesn't do that across the statute like that. It's a sentencing enhancement. It's not part of the crime. The crime is theft. It's obtaining the funds. But it's an element of the crime that you have to describe the property that's being stolen. Sorry. Yeah, no, I'm sorry. At any time we have, what we're saying is the charging constraint was right in some way. You have to show prejudice. You have to show how the defendant was put off. And the thing is, the identity of the stolen property, that hasn't changed. Everybody has always known what they were talking about. It's the checks they got when they put in these false invoices. That stays the same, the identity of the property. What was different is the owner. So this isn't an instance of where I am charged with punching Bill but I actually punched Bob because those are completely different people. The defendant is going to be prejudiced because you've proved a whole different crime. Here it's just you got the owner wrong. That happens sometimes. If I steal a car and I don't have the right state registered owner, I still stole the car. And the defendant is not put out because he doesn't know all of a sudden which car it was. Here there was never any question where the funds came from, what the funds were. They were the funds reimbursing them for the Medicaid treatment that the MCO was contracted by the state to provide. So you're saying the variance, whatever variance there is, if there is one, there's no prejudice. Yes, there's no fatal variance, Your Honor. Because everybody knew what they were talking about. What it comes down to is this legal issue at the very top of who actually owns the funds we all know we're talking about. So unless there are any further questions, we would ask that this Court affirm the trial court's judgment in both cases. Thank you. I'd like to take a moment to address Ms. Kranz's testimony, the points that a person here made about Ms. Kranz's testimony. Ms. Kranz told Ms. Booker that she thought the figures were a little high with the units and the pricing, that she did think that there was an issue with the pricing.  It's also the case that Ms. Kranz did not know what the products were to which she was assigning billing codes. She testified eventually that she learned that it was the Dexcom. She had never seen it before. She didn't know what it was. So from Ms. Booker's perspective, Ms. Kranz wouldn't have been in a position to know what was too high a price necessarily, especially for a product that was as new as the Dexcom was. And when you combine that with the fact that Ms. Kranz was also refusing to use this miscellaneous code, which that was in fact the correct code, even according to the Blue Cross Blue Shield witness, you know, I don't think Ms. Booker firing her under these circumstances can reasonably lead to an inference of some sort of guilty knowledge. Now, opposing counsel talked about the character of her reaction, that that, from that we can infer some guilty knowledge. But it's also the case that she calls the police over to Integrity's offices. That is not the reaction of a person who thinks that there's some criminal scheme happening at this office. So I think these circumstances do not, they're inconsistent with guilty knowledge. You know, the state also pointed out that this court, and this court obviously is aware, that the standard of review on appeal is favorable to the state. But this court, that standard of review doesn't mean that the court can just disregard unrebutted and uncontradicted testimony that is negative to the state. For example, in the state's briefs, they talk about how this court should find that testimony about the prior authorization department was a pure fabrication, and that no such department existed in Integrity. But the state didn't actually offer any hard evidence rebutting the testimonies of both Ms. Booker and Ms. Thomas about the role of the prior authorization department, which was, those were the employees that were responsible for putting in the amounts of censors. And the state could have developed such evidence, right? They could have asked Brittany Kranz or Inspector Gallivan, for example, about the existence of this department, or which employees were in charge of assembling those prior authorization documents for submission prior to preapproval, who put those amounts down first. The state didn't develop any of that evidence, and of course the trial court can determine the credibility of the evidence, but in the absence of any evidence to the contrary, the court can't just disregard unrebutted and uncontradicted testimony. Here, for example, about the prior authorization department's existence, and it was the uncontradicted testimony. It was these other employees' jobs to prepare the documents submitted to gain preapproval, which first included the amounts of the censors, and this included pricing, number of units. To the extent that there was any unauthorized control or control by deception that was effected through the preparation of these documents, the state simply did not, in addition to showing inadequate, not showing Ms. Booker's knowledge, they didn't connect that conduct back to Ms. Booker. With respect to the concession that the state refers to, again, I don't make the concession they're saying it was a misstatement, but to the extent that this court finds a concession due to the misstatement I made in my brief, it wasn't my intention. Certainly this court doesn't have to follow that so-called concession or be bound by it. You know, the state's position overall seems to be, well, something suspicious happened here, an overbilling occurred, and because Ms. Booker and Ms. Thomas were in high positions at this company, we're just going to hold them responsible. But that is not enough to prove criminal liability beyond a reasonable doubt. Maybe there's some civil action here, I don't know, but they have not proven criminal liability beyond a reasonable doubt. And so if there were no questions from this court, I'd again ask that you reverse Ms. Booker's convictions. Thank you. Thank you. A few points on the liability argument before it turns back to the governmental property issue. So in both of these arguments, the state repeatedly asks this court to make inferences and to use its common sense. That is not proof beyond a reasonable doubt. So in terms of the liability argument, the state has offered several repackagings of its position that CEOs are necessarily criminally liable for anything that happens at their company. So first, the state's position is that theft, the only thing that's needed to prove theft is that someone has obtained proceeds. So in a corporate situation like this, any wrongdoing could have happened, and as long as that results in the company making more money, apparently that CEO is now criminally liable, even for Class X theft. That's the state's position. Here, though, Ms. Thomas did not obtain any funds as a result of this conduct in a personal capacity. At most, the state introduced checks that, to integrity, that she endorses the CEO. That is not proof that she has obtained proceeds in some personal capacity. I believe the state has also said that Ms. Thomas' name is all over these invoices. I believe that the record only shows that her name shows up on the Blue Cross documents that were part of the investigation after Blue Cross found these discrepancies. It is not the case that Ms. Thomas' name is all over any of the actual invoices that we're worried about here. The state also now argues that the Medline invoice does constitute theft, and that any quantity of loss as a result of the repeated use of that invoice did not ever need to be proved. Again, the identity of the property is an element that has to be proven, and so the quantity is part of that identity, particularly when we're concerned about this mix of private and public funds in this MCO arrangement. So the state wants to argue now that the Medline invoice did result in some portion of this $100,000 of loss. It needed to quantify that at trial. Based on the spreadsheet that it used to quantify the loss on that four-box versus one-box discrepancy, it easily could have done so. The state chose not to do that. It didn't introduce any evidence of any loss from that Medline invoice. The state cannot now argue that using that Medline invoice was the actus reus of these offenses. Turning to the governmental property question, the state's position is basically it's common knowledge that these are Medicaid funds, and that that is all that was needed to prove a loss of governmental property of the specific amount of over $100,000. But we know that once the MCOs are in play, and once they are the ones paying for expenses for these recipients, it is at least possible that it is a mix of public and private funds. So take the situation where the capitation fee does not cover that patient's actual expenses. We know from the Seventh Circuit in Molina that it's the MCO that's left holding the bag in that situation. They're on the hook for those expenses. They've already used up the state's money on that from that capitation fee. They're going to have to pull from some other source to cover that patient's expenses. It really is a private source of their own revenue. So it is not simply common knowledge that every single penny at issue here was governmental property. There is at least the possibility that it was a mix of public and private funds. There's really even the possibility that it was entirely private funds because we have no idea what these capitation fees were. We have no idea the contracts between HFS and these MCOs. We really don't even know whether the capitation fees for these recipients in question even exceeded $100,000 during this time period. We have no idea. So we have no idea whether the state even spent over $100,000 in the first place on these recipients. So it is not simply common knowledge that every penny here constitutes governmental property. Again, the state relies on Castillo for this issue of judicial notice. To be clear, Castillo is not a Medicaid or an MCO case. That concerned whether an Illinois prison is public property. That is not proof here that the state's theory that this is all governmental property is something that can be adopted through judicial notice. Well, the state could have asked the trial court to take judicial notice of the regulations, in other words, right? It could have. It did not. And the law as such, as I understand it, is that a reviewing court can take judicial notice of anything that a trial court can take judicial notice of. True? Correct. As long as it's a fact, again, that is readily verifiable from a single source. To take the state's gas station example, so I think one helpful example here would be, say an employee at that gas station gets their paychecks in cash. They get that paycheck that week, and on the way out the door, they're robbed of that money. They didn't get a chance to pay their taxes on it yet. The state arguably has an interest in those taxes being paid. Under the state's position in that case, that was a robbery of governmental property because the state had some interest in those taxes being paid out of that cash paycheck. I think clearly that is not a robbery of governmental property, so by extension here, it was not a loss of every penny of $100,000 of governmental property of the state of Illinois here. Now finally, the state argues that Ms. Thomas would have to show prejudice in the variation between what was alleged in the indictment and the proof at trial. Again, Ms. Thomas is not making a fatal variation argument. Her position is that the identity of the funds is an element, not simply that the state's evidence varied, but that it's an element that must be made out in the charging instrument. And again, I think it's very important to look at comps two and three. When the state indicted this case, they thought that they were going to introduce evidence of payments from HFS and then did not introduce a single payment from HFS. When they indicted this case, they thought they were discussing a different identity of property than anything that came out at trial. It was property of the MCOs. So that is an element that the state failed to prove, and so the failure to prove governmental property does require reversing all of her convictions. Unless the court has any further questions, I'll leave it there. Thank you. Okay, I want to thank our counsel for excellent arguments and excellent briefing. It's a very interesting case, and we enjoyed the arguments this morning, and that will be taken under revised.